**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**HERITAGE COMPANY, INC.**                                              **PLAINTIFF**


**v.**                                    **CASE NO. No. 4:22CV00082-JM**


**HUDSON EXCESS INSURANCE COMPANY, et al.**                    **DEFENDANTS**

**MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW Plaintiff, Heritage Company, Inc. ("Heritage"), by and through its attorneys, Charles Darwin "Skip" Davidson, Nickolas W. Dunn, and the Davidson Law Firm and Louis S. Franecke of the Franecke Law Group, and for its Motion for Partial Summary Judgment states:

1.  Defendant Hudson Access Insurance Company ("Hudson") issued its "Smart Cyber Insurance Policy for The Heritage Company, Inc. ("Policy") effective April 1, 2019, to April 1, 2020, Policy Number CYB 1002552-00. Heritage paid the full premium required for issuance of the policy.

2.  On or about October 15, 2019, Heritage suffered a catastrophic cyber-attack, triggering the coverage provisions of the Hudson Policy.

3.  The Policy language is clear and unambiguous as to what losses are covered under the Policy. The Policy covers Heritage's Business Interruption to a limit of liability of $3,000,000 for each claim. The Policy defines coverage for Heritage's Business Income Loss (P. 11 of 30) as follows:

    a. The net profit before income taxes that the insured is prevented from earning during the Interruption Period;

        and

1

    b. Normal operating expenses incurred by the insured (including payroll), but solely to the extent that such operating expenses must continue during the Interruption Period and would have been incurred had there been no interruption or degradation in service.

4.   There are no contradictory or ambiguous other definitions or language in the Policy which affect the clear meaning in plain language of the Policies definition of Business Income Loss.

5.   When an insurance policies language is unambiguous, its interpretation is a matter of law for the court and not a jury.

6.   Heritage has suffered a net loss profit before income tax subject to proof of amount at trial and forensic accounting to be determined.

7.   Heritage has suffered normal operating expenses (including payroll) which had to continue during the Interruption even if no cyber-attack had occurred in order to generate diminished revenue subject to proof and forensic accounting at trial.

8.   There is no genuine issue of material fact regarding the construction of the Policy and what Plaintiff is entitled to, as a matter of law, and that the Policy be construed as to give effect to the specific language of the Business Income Loss as defined in the Policy.

9.   In further support of its motion Plaintiff hereby incorporates and relies upon the following:

    a.   Exhibit A – the Policy.

    b.   Exhibit B – Affidavit of Jennifer Franecke.

    c.   Exhibit C – Affidavit of John Toney.

    d.   Exhibit D – Affidavit of Lou Franecke.

    e.   Plaintiff's Brief in Support of its Motion filed contemporaneously herewith including exhibits and affidavits.

    f.   Plaintiff's Statement of Undisputed Facts filed contemporaneously herewith.

WHEREFORE, Plaintiff, Heritage, prays this Honorable Court grant this Motion for Partial Summary Judgment, enter an order defining the clear and unambiguous language of the Policies coverage for Business Income Loss, obligation for payment of such provisions according to proof at trial by Heritage, and for all other just and proper relief.

Respectfully submitted,

**THE HERITAGE COMPANY, INC., PLAINTIFF**

Louis S. Franecke
Franecke Law Group
1115 Irwin Street, Suite 100
San Rafael, CA 94901-3321
415-457-7040
Lh-franeckelaw@sbcglobal.net

DAVIDSON LAW FIRM
P. O. Box 1300
Little Rock, Arkansas 72201
Telephone: (501) 320-5132
Facsimile: (374-5917

Charles Darwin "Skip" Davidson
Ark. Bar No. 73026
skipd@dlf-ar.com

Nickolas W. Dunn
Ark. Bar No. 2019115
nickd@dlf-ar.com

## CERTIFICATE OF SERVICE

On October 28, 2022, a copy of the foregoing was filed with the Clerk of Court using the

CM/ECF system, which shall send notice of such filing to all counsel of record and constitute

service of the same.

Edward R. Brown
Jessica N. Gallinaro
David H. Topol
Ashley Eiler
Wiley Rein LLP
2050 M Street NW Washington, DC 20036
202-719-7580
erbrown@wiley.law
jgallinaro@wiley.law
dtopol@wiley.law
aeiler@wiley.law

David M. Donovan
Watts, Donovan, Tilley & Carson, P.A.
2120 Riverfront Drive, Suite 275
Little Rock, AR 72202
(501) 372-1406
david.donovan@wdtc.law





# Smart Cyber Insurance™ Policy for
## The Heritage Company, Inc

Policy Number: CYB-1002552-00

Effective Date: April 01, 2019
Expiration Date: April 01, 2020

**Corvus Insurance Agency, LLC**
33 Arch Street, Suite 3210, Boston, MA 02110

Exhibit A



## CORVUS SMART CYBER INSURANCE™ DECLARATIONS PAGE

### POLICY NUMBER                CYB-1002552-00

### ITEM 1 - INSURED

Named Insured: The Heritage Company, Inc

Principal Address: 2402 Wildwood Ave Sherwood, AR 72120

This contract is registered and delivered as a surplus line coverage under the Surplus Lines Insurance Law, and it may in some respects be different from contracts issued by insurers in the admitted markets, and, accordingly it may, depending upon the circumstances be more or less favorable to an insured than a contract from an admitted carrier might be.  The protection of the Arkansas Property and Casualty Guaranty Act does not apply to this contract.  A tax of four percent (4%) is required to be collected from the insured on all surplus lines premiums.

### ITEM 2 - POLICY PERIOD

Inception Date: 04/01/2019

Expiration Date: 04/01/2020

12:01 a.m. standard time both dates at the Principal Address stated in ITEM 1.

### ITEM 3 - INSURER

Insurer: Hudson Excess Insurance Company

### ITEM 4 - NOTICE OF CLAIM

Notice of Claim or Loss must be sent to the Company by Email as set forth below:

Email: cyberclaims@corvusinsurance.com

Corvus Smart Cyber Insurance™ 24/7 Breach Response Hotline: (844) 844-0105



## ITEM 5 - INSURING AGREEMENTS

Coverage included as of the inception date in Item 2:

Third Party Insuring Agreements

    ☑ A. Network Security and Privacy Liability

    ☑ B. Regulatory Investigations, Fines and Penalties

    ☑ C. Media Liability

    ☑ D. PCI DSS Assessment Expenses

    ☑ E. Breach Management Expenses

First Party Insuring Agreements

    ☑ A. Business Interruption

    ☑ B. Contingent Business Interruption

    ☑ C. Digital Asset Destruction, Data Retrieval and System Restoration

    ☑ D. System Failure Coverage

    ☑ E. Social Engineering & Cyber Crime Coverage

    ☑ F. Reputational Loss Coverage

    ☑ G. Cyber Extortion and Ransomware Coverage

    ☑ H. Breach Response and Remediation Expenses

    ☑ I. Court Attendance Costs



## ITEM 6 - LIMITS & RETENTION

A. Third Party Insuring Agreements

| Insuring Agreements | Limit of Liability | Retention |
|---|---|---|
| Network Security and Privacy Liability | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Claim |
| Regulatory Investigations, Fines and Penalties | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Claim |
| Media Liability | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Claim |
| PCI DSS Assessment Expenses | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Claim |
| Breach Management Expenses | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Claim |



B. First Party Insuring Agreements

| Insuring Agreements | Limit of Liability | Retention, Waiting Period, and Period of Indemnity |
|---|---|---|
| Business Interruption | $3,000,000 Each Claim/ $3,000,000 Aggregate | Waiting Period: 6 Hours Period of Indemnity: 6 Months |
| Contingent Business Interruption | $3,000,000 Each Claim/ $3,000,000 Aggregate | Waiting Period: 6 Hours Period of Indemnity: 6 Months |
| Digital Asset Destruction, Data Retrieval and System Restoration | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Loss |
| System Failure Coverage | $3,000,000 Each Claim/ $3,000,000 Aggregate | Waiting Period: 6 Hours Period of Indemnity: 6 Months |
| Social Engineering & Cyber Crime Coverage | $250,000 Each Claim/ $250,000 Aggregate | $10,000 Each Loss |
| Reputational Loss Coverage | $3,000,000 Each Claim/ $3,000,000 Aggregate | Period of Indemnity: 6 Months Waiting Period: 2 Weeks |
| Cyber Extortion and Ransomware Coverage | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Loss |
| Breach Response and Remediation Expenses | $3,000,000 Each Claim/ $3,000,000 Aggregate | $10,000 Each Loss |
| Court Attendance Costs | $250,000 Each Claim/ $250,000 Aggregate | $10,000 Each Loss |

C. Maximum Policy Aggregate Limit: $3,000,000



## ITEM 7 - PREMIUM

$5,132

## ITEM 8 - EXTENDED REPORTING PERIOD

1 year: 100% of the annual policy premium

2 years: 150% of the annual policy premium

3 years: 200% of the annual policy premium

## ITEM 9 - POLICY FORM

Corvus Smart Cyber Insurance Policy Form No. **CB-101-001**



## ITEM 10 - ENDORSEMENTS

| Endorsement Name | Form No. |
|---|---|
| Breach Response and Remediation Expenses Outside the Limit | CB-108-001 |
| Defense Expenses Outside the Limit - $1,000,000 | CB-109-001 |
| GDPR Coverage | CB-111-002 |
| Reliance - Chubb | CB-113-001 |
| Solicitation Claims - $50,000 Sublimit | CB-120-001 |
| Criminal Reward Expenses - $50,000 Sublimit | CB-123-001 |
| Bricking - $100,000 Sublimit | CB-126-001 |
| Loss of Funds Exclusion Carveback | CB-128-001 |
| Invoice Manipulation Loss - $50,000 Sublimit | CB-133-001 |
| Forensic Accounting Coverage - $50,000 Sublimit | CB-136-001 |
| Coverage for Certified Acts of Terrorism | CB-202-001 |



Named Insured: **The Heritage Company, Inc**
Policy Number: **CYB-1002552-00**
Effective Date: **04/01/2019**
Writing Company: **Hudson Excess Insurance Company**

## Coverage for Certified Acts of Terrorism Endorsement

**You** and **we** agree to the following:

1. Exclusions, item 19. is deleted and replaced with the following:

   7. **terrorism**; this exclusion shall apply and prevent any and all coverage for losses arising from **terrorism**, regardless of whether any other cause or event that otherwise would be covered contributes in any way to the loss. This exclusion does not apply to a **certified act of terrorism**, however:

   a. **we** will not pay any amounts for which **we** are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 as amended (the "Act"); and

   b. the amendment of this exclusion does not create coverage for any loss that would otherwise be excluded under the Policy. All other policy terms and conditions, including the Policy's exclusions, remain in full force and effect, even in the event of a **certified act of terrorism**.

2. Definitions is changed to add the following:

   **Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act (the "Act"). Section 102(1) of the Act requires such act be certified to be an act of terrorism and resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Act; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



In all other respects, the policy remains the same.



2. Definitions is changed to add the following:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. Section 102(1) of the Act requires such act be certified to be an act of terrorism and resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Act; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

In all other respects, the policy remains the same.

---

**NOTICE**
COVERAGE FOR **CERTIFIED ACTS OF TERRORISM** IS INCLUDED IN YOUR POLICY. UNDER YOUR COVERAGE, ANY LOSSES RESULTING FROM **CERTIFIED ACTS OF TERRORISM** MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY THE TERRORISM RISK INSURANCE ACT, AS AMENDED. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020 OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INVESTORS' LIABILITY FOR LOSSES RESULTING FROM **CERTIFIED ACTS OF TERRORISM** WHEN THE AMOUNT OF SUCH LOSSES EXCEEDS $100 BILLION IN ANY ONE CALENDAR YEAR. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

---

Signature: _____



# Notice to Policyholders

Coverage under this **Policy** is provided on a claims made and reported basis. This Policy applies only to **Claims** first made against the **Insured** during the **Policy Period** and reported in writing or by electronic notice to the **Company** during the **Policy Period** or Extended Reporting Period, if applicable, or to **Loss** first discovered by the **Insured** and notified in writing or by electronic notice to the **Company** during the **Policy Period** or Extended Reporting Period, if applicable, and subject to all other terms.

Any obligation or payment owed by the **Company** shall in every case be subject to the Limits of Liability as stated in the Declarations. **Defense Expenses** shall reduce the applicable Limits of Liability, subject to any applicable **Retention**, and may completely exhaust the Maximum Policy Aggregate Limit of Liability. This **Policy** only affords coverage under those Insuring Agreements below that are indicated as purchased in Item 5 of the Declarations.

Please review the coverage afforded under this **Policy** carefully, and discuss it with your insurance agent or broker.



# CORVUS SMART CYBER INSURANCE

In consideration of the payment of premium, reliance upon the **Application**, and subject to all terms of this Policy, the **Company** agrees to indemnify the **Insured** in excess of the **Retention** or after the expiration of the **Waiting Period**, as indicated in Item 6 of the Declarations page, for:

## THIRD PARTY INSURING AGREEMENTS

I. Amounts which the **Insured** is legally obligated to pay as a direct result of a **Claim** first made against the **Insured** during the **Policy Period**, and reported in writing or by electronic notice to the **Company** during the **Policy Period** or Extended Reporting Period, if applicable, for:

   A. **Network Security and Privacy Liability**

   **Damages** and **Defense Expenses** which the **Insured** is legally obligated to pay as a result of a **Claim** arising from a **Security Breach** or **Privacy Breach**.

   B. **Regulatory Investigations, Fines, and Penalties**

   **Regulatory Fines and Penalties** and **Defense Expenses** which the **Insured** is legally obligated to pay as a result of a **Claim** arising from a **Security Breach** or **Privacy Breach**.

   C. **Media Liability**

   **Damages** and **Defense Expenses** which the **Insured** is legally obligated to pay as a result of a **Claim** arising from **Media Activities**.

   D. **PCI DSS Assessment Expenses**

   **PCI DSS Assessment Expenses** and **Defense Expenses** which the **Insured** is legally obligated to pay as a result of a **Claim** arising from a **Security Breach** or **Privacy Breach**.

   E. **Breach Management Expenses**

   **Breach Management and Incident Response Expenses** which the **Insured** has contractually indemnified a **Third Party** for a **Security Breach** or **Privacy Breach** when the **Insured** has a legal obligation to notify affected individuals.

## FIRST PARTY INSURING AGREEMENTS

II. **Loss**, first discovered by the **Control Group** during the **Policy Period** and reported in writing or by electronic notice to the **Company** during the **Policy Period** or Extended Reporting Period, if applicable, for:

   A. **Business Interruption**

   **Business Income Loss** and **Extra Expenses** incurred during the **Interruption Period** directly as a result of the total, or partial, or intermittent interruption or degradation in service of an **Insured's Computer System** caused directly by a **Privacy Breach**, **Security Breach**, **Administrative Error** or **Power Failure**.



B. **Contingent Business Interruption**

**Business Income Loss** and **Extra Expenses** incurred during the **Interruption Period** caused directly as a result of the total, partial, or intermittent interruption or degradation in service of the **Computer System** of an **Outsourced Service Provider** caused directly by a **Privacy Breach**, **Security Breach**, or **Administrative Error** at that **Outsourced Service Provider**.

C. **Digital Asset Destruction, Data Retrieval and System Restoration**

**Digital Asset Loss** and **Related Expenses** incurred as a direct and necessary result of a **Privacy Breach**, **Security Breach** or **Administrative Error**.

D. **System Failure Coverage**

**Business Income Loss**, **Extra Expenses**, and **Digital Asset Loss** incurred during the **Interruption Period** directly as a result of an unintentional or unplanned outage caused by **Administrative Error**, **Unintentional Damage or Destruction**, or **Computer Crime and Computer Attacks**.

E. **Social Engineering and Cyber Crime Coverage**

**Financial Fraud Loss**, **Telecommunications Fraud Loss**, **Phishing Attack Loss**, theft of **Funds Held in Escrow**, or theft of **Personal Funds** incurred directly as a result of **Financial Fraud**, **Telecommunications Fraud**, or **Phishing Attack**.

F. **Reputational Loss Coverage**

**Reputational Loss** incurred during the **Interruption Period** as a direct result of a **Media Event** arising from a **Privacy Breach**, **Security Breach**, **Cyber Extortion Threat**, or **Phishing Attack**.

G. **Cyber Extortion and Ransomware Coverage**

**Extortion Expenses** and **Extortion Payment** incurred directly as a result of a **Cyber Extortion Threat**.

H. **Breach Response and Remediation Expenses**

**Breach Management and Incident Response Expenses** incurred directly as a result of a **Privacy Breach** or **Security Breach**.

I. **Court Attendance Costs**

Expenses incurred to attend court for any tribunal, arbitration, adjudication, mediation or other hearing in connection with any **Claim** for which the **Insured** is entitled to indemnity under this policy.



## DYNAMIC LOSS PREVENTION SERVICES

III. Consultative and support services requested by the **Insured** prior to notifying the **Company** of a potential **Loss** or **Claim**, including:

A. **IT Security Assessments**

The **Insured** shall have access to network security assessments and recommendations provided by the **Company's** data provider throughout the **Policy Period**. The **Insured** may request assessments as frequently as once every fourteen (14) business days.

B. **Pre-Claim Support Services**

If the **Company** is provided with notice of a potential Loss or of a **Claim** that is not yet a Loss or **Claim** under this policy and the **Insured** requests the Company's assistance to mitigate against such a **Claim** or Loss, the **Company** may agree to pay for up to $1,000,000 in Breach Management and Incident Response Expenses. Any such fees must be incurred with the **Company's** prior written consent by an attorney or consultant we have mutually agreed upon. Such attorney's and consultant's fees will be considered **Claim** expenses or Loss and will be subject to the Limits of Liability that would be applicable if a covered **Claim** is made and is also subject to the Policy's Aggregate Limit of Liability.

## EXCLUSIONS

The **Company** shall not be liable for any **Claim**, **Damages**, **Defense Expenses** or **Loss** based upon, arising out of, or in any way attributable to:

1. **Prior Knowledge or Notification**

Any act, fact, error, omission, event, incident, occurrence, claim or circumstance that could reasonably be expected to give rise to a claim notified to a previous insurer, or which occurred or commenced prior to the inception date of this **Policy** if at the inception date the **Control Group** knew or which could have reasonably expected that the act, fact, error, omission, event, incident, occurrence, claim or circumstance could result in as likely to form the basis for a **Claim** or **Loss** under this **Policy**;

2. **Deliberate Acts**

The **Insured's** willful deliberate, malicious, fraudulent, dishonest, or criminal act or violation of law with the knowledge, connivance or acquiescence of any member of the **Control Group**; however, this exclusion shall not apply to **Defense Expenses** incurred in defending any such **Claim** until such time that there is final adjudication establishing such conduct, at which time the **Insured** shall reimburse the **Company** for all **Defense Expenses** incurred. Facts, or knowledge possessed by the **Control Group** regarding the foregoing conduct shall be imputed to other **Insureds**;

3. **Insured. vs Insured**

Any **Claim** made by or on behalf of an **Insured** against another **Insured**. This exclusion shall not apply to any **Claim** brought by an **Employee** outside of the **Control Group** as a result of a **Privacy Breach** or **Security Breach**;



4. **Bodily Injury**

Physical injury, sickness, disease, or death sustained by any individual and, where resulting from such physical injury only, mental anguish, mental injury, shock or emotional distress;

5. **Property Damage**

Physical Injury to, or impairment, destruction or corruption of, any tangible property, including personal property in the care, custody or control of the **Insured**. **Data** and **Digital Assets** are not tangible property;

6. **Employment Practices**

Any employer-employee relations, policies, practices, acts or omissions, any actual or alleged refusal to employ any persons or any misconduct, including physical or sexual, with respect to **Employees**, including negligent employment, investigation, supervision, hiring, training or retention of any **Employee**, **Insured** or person for whom the **Insured** is legally responsible. However, this exclusion does not apply to a **Privacy Breach**;

7. **Breach of Contract**

Any breach of any express, implied, actual or constructive contract, warranty, guarantee or promise. This exclusion does not apply to:

   a. Any liability or obligation an **Insured** would have had in the absence of such contract, warranty, guarantee or promise and which would have been insured by this Policy;

   b. A breach of the **Insured's** privacy policy; or

   c. An otherwise covered **Claim** under Insuring Agreement I. D. PCI DSS Assessment Expenses;

8. **Description of Price of Goods**

Actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products, or services, including cost guarantees, cost representations, contract price, or cost estimates being exceeded;

9. **Discrimination**

Any actual or alleged discrimination of any kind, including but not limited to age, color, race, gender, religion, creed, national origin, marital status, sexual orientation, sexual preference, disability, financial condition, or pregnancy, including violations of civil rights or discrimination or retaliatory conduct of any kind;

10. **Government Intervention**

Non-discriminatory measures of a government taken in the public interest for the purposes of ensuring public safety, raising revenues, protecting the environment or regulating economic activities;



11. **Patent Infringement**

The actual or alleged:

    a.  Infringement of any patent or patent rights or misuse or abuse of a patent; or

    b.  The misappropriation, theft, copying, display or publication of any trade secret, unless arising out of a Privacy Breach or Security Breach;

12. **Bankruptcy**

The insolvency, liquidation or bankruptcy of any person or entity, including any **Insured** to the extent permitted by law, or the failure, inability or unwillingness of any person or entity or **Insured** to make payments or perform obligations or conduct business because of insolvency, liquidation, or bankruptcy; However, the **Insured's** insolvency will not relieve the **Company** of any legal obligation under this contract of insurance where this insolvency does not give rise to a claim under this policy;

13. **Loss of Funds**

    a.  Loss, decrease in value or theft of securities or currency;

    b.  Trading losses, liabilities or changes in trading account value; or

    c.  The value of electronic funds, money, securities or wire transfer;

14. **Force Majeure**

Any loss incurred as a result of a natural disaster, including fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail or any other natural physical event however caused;

15. **Payment Card Industry**

The failure by the **Insured** to comply with or follow the Payment Card Industry Data Security Standards, Merchant Services Agreements or any Payment Card Company rules, or the failure to implement, maintain or comply with any payment card industry security measures or standards. However, this exclusion does not apply to Insuring Agreement I.D. PCI DSS Assessment Expenses;



16. **Pollutants**

Any actual or alleged or threatened presence, discharge, dispersal, release, escape or failure to detect pollutants or solid, liquid, gaseous or thermal irritant or contaminant of any kind, including smoke, vapor, soot, fumes, other air emission, acids, toxic chemicals, alkalis, mold, spores, fungi germs, odor, waste, water, oil or oil product, infectious or medical waste, asbestos or asbestos product, lead or lead product, noise, and electric, magnetic, or electromagnetic field chemicals, or waste (including waste material to be recycled, reconditioned, or reclaimed), whether or not such presence, discharge, dispersal, release, escape or failure to detect results from the **Insured's** activities or the activities of others of whether such presence happened suddenly, gradually, accidentally or intentionally. This exclusion shall not apply to an otherwise covered claim under Insuring Agreement I. A. Security and Privacy Liability and I. B. Regulatory Investigations, Fines, and Penalties;

17. **Satellite, Electrical or Mechanical Failures**

Satellite failures; electrical or mechanical failures including spike, brownout or blackout; failures of overhead or subterranean transmission and distribution lines; or outage to utility infrastructure, including gas, water, telecommunications, telephone, internet, or cable, unless such infrastructure is under the **Insured's** direct operational control;

18. **Specific Legislation**

   a. The actual or alleged purchase, sale, or offer of, or solicitation of an offer to purchase or sell securities, or violations of any securities law including but not limited to the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes Oxley Act of 2002, including "Blue Sky" laws;

   b. The actual or alleged violation of the Organized Crime Control Act of 1970 (RICO);

   c. The actual or alleged government enforcement of any state or federal law or regulation including law or regulations promulgated by the United States Federal Trade Commission, Federal Communications Commission, or the Securities and Commission; however, this exclusion does not apply to Insuring Agreement II. B. Regulatory Investigations, Fines, and Penalties;



d. Any breach or alleged breach of any workers' compensation, unemployment compensation, disability benefits or similar laws, including the Federal Employers Liability Act, the Fair Labor Standards Act of 1938, the National Labor Relations Act, the Worker Adjustment and Retraining Act of 1988, the Certified Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act of 1970;

e. Any violation of any pension, healthcare, welfare, profit sharing, mutual or investment plans, funds, or trusts; or any violation of any provision of the Employee Retirement Income Security Act of 1974 and/or the Pension Protection Act of 2006;

f. The violation of, or the exposure of the **Insured** or **Company** to, any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, UK, or USA;

g. The Telephone Consumer Protection Act of 1991 or CAN-SPAM Act of 2003 or any similar state or federal statute, law, regulation or rule with regard to unsolicited distribution of email, text messages, direct mail, facsimiles, spam, actual or alleged wiretapping, audio or video recording, or telemarketing;

19. **Terrorism**

Any act of terrorism, except for a terrorist event perpetrated by electronic or internet based applications or means;

20. **Unauthorized Trading**

Any and all trading by an **Insured**, including trade that at the time of the trade is:

a. In excess of permitted financial limits; or

b. Outside of permitted product lines;

21. **Anti-Trust Laws and Unfair Competition**

Any actual or alleged violation of any anti-trust statute, legislation or regulation including the Sherman Anti-Trust Act, the Clayton Act or any similar provisions of any federal, state or local statutory law or common law; or unfair competition, price fixing, deceptive trade practices;

22. **Use of Illegal or Unlicensed Programs**

Use of illegal or unlicensed programs or software;

23. **War**

Confiscation, nationalization, requisition, strikes, labor strikes or similar labor actions; war, invasion, or warlike operations, civil war, mutiny, rebellion, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military coup or usurped power;



24. **Radioactive Contamination, Chemical, Biological, Biochemical and Electromagnetic**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to, by, or arising from:

a. Ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste;

b. The radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;

c. Any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

d. The radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter;

e. Any chemical, biological, bio-chemical or electromagnetic weapon;



## DEFINITIONS

**Administrative Error**

An error or omission by an **Employee** or member of the **Control Group** in the input, processing or output of the **Insured's Digital Assets** of the **Insured's Computer System** operation or maintenance; With respect to Insuring Agreement II. B. Contingent Business Interruption, **Administrative Error** includes error or omission by an employee of an Outsourced Service Provider in the input, processing or output of the **Insured's Digital Assets** or the **Outsourced Service Provider's Computer System** operation or maintenance.

**Application**

All information provided by or on behalf of the **Insured** to the **Company** as part of any request for this **Policy**, including any supplemental information submitted therewith; All of the above are deemed attached to, material and incorporated into this **Policy**;

**Breach Management and Incident Response Expenses**

a. Costs of an external IT security expert to determine the cause, scope and extent of the **Privacy Breach** or **Security Breach** or any immediate actions necessary to mitigate ongoing harm to the **Insured's Computer System**;

b. Costs and expenses of a legal firm to determine any actions necessary to comply with **Privacy Regulations**;

c. Notification costs and related expenses to notify:

    I. Individuals who are required to be notified in compliance with **Privacy Regulations** mandating notifications; or

    II. Any individual affected by the actual or suspected cyber event or to send email notices or issue substitute notices;

    III. Costs of setting up a telephone call center in order to support notified individuals and to provide credit file monitoring services and/or identity theft assistance;

d. **Crisis Management Expenses**;

e. Costs to provide credit monitoring services, identity monitoring services, identity restoration services or identity theft insurance to affected individuals for up to 24 months.

f. Access to **Company's** 24/7 Cyber Incident Response Hotline;

g. Costs to obtain initial report support and assistance from the **Company**;



h. Costs to conduct a forensic investigation of the **Insured's Computer System** where reasonable and necessary or as required by law or a regulatory body (including a requirement for a PCI Forensic Investigator);

i. Costs to contain and remove any malware discovered on the **Insured's Computer Systems**;

j. Costs to complete an information security risk assessment;

k. Costs to conduct an information security gap analysis;

**Business Income Loss**

a. The net profit before income taxes that the **Insured** is prevented from earning during the **Interruption Period**; and

b. Normal operating expenses incurred by the **Insured** (including payroll), but solely to the extent that such operating expenses must continue during the **Interruption Period** and would have been incurred had there been no interruption or degradation in service;

**Business Income Loss** does not include any:

I. Contractual penalties;

II. Costs or expenses incurred to update, restore, replace or improve a **Computer System** to a level beyond that which existed just before the Interruption of Service;

III. Expenses incurred to identify or remediate software program errors or vulnerabilities;

IV. Legal costs or expenses;

V. Loss arising out of liability to any third party;

VI. Other consequential loss or damage; or

VII. Extra Expenses;

**'Business Income Loss'**, as used in item a. Shall mean:

a. For manufacturing operations, the net sales value of production less the cost of all raw stock, materials and supplies used in such production;



**Claim**

The following, when first received in writing or by electronic notice by any **Insured** during the **Policy Period** or, if applicable, an Extended Reporting Period.

a. A notice of an intention to hold the **Insured** responsible for **Damages**, including the service of legal proceedings, the institution of arbitration or mediation, or a written request to toll or waive a statute of limitations against any of the **Insureds**;

b. A request for information, civil investigative demand, formal civic administrative proceeding or formal regulatory action only to the extent covered by Insuring Agreement I. B. Regulatory Investigations, Fines, and Penalties;

c. A demand for **PCI DSS Assessment Expenses** only to the extent covered by Insuring Agreement I. D. PCI DSS Assessment Expenses.

First receipt by any **Insured** is deemed to be first receipt by all **Insureds**.

**Company**

The Insurer listed under Item 3 of the Declarations Page.

**Computer Crime and Computer Attacks**

An unintentional or negligent act, error or omission by an **Insured**, or an **Outsourced Service Provider** in the operation of an **Insured's Computer System** or in the handling of **Digital Assets**, which fails to prevent or hinder attacks on an **Insured's Computer System**, including, but not limited to **Denial of Service** attacks, unauthorized access, infection of malicious computer code, unauthorized use or an act of cyber terrorism.

**Computer System**

A system of interconnected hardware and peripherals, and associated software, including Internet of Things (Iot) devices, systems and application software, terminal devices, related communication networks, mobile devices, storage and back-up devices, operated by the **Insured** or an **Outsourced Service Provider**; With respect to Insuring Agreement II. A. Business Interruption, a **Computer System** will not include devices, systems, software, or networks operated by an **Outsourced Service Provider**;

**Control Group**

Any of the Chief Executive Officer, Chief Financial Officer, Chief Information Officer, Chief Operating Officer, Chief Information Security Officer, Chief Legal Officer/General Counsel, Risk Manager or functional equivalent;

**Crisis Management Expenses**

Expense reasonably incurred by the **Insured** and approved in writing in advance by the **Company** for the employment of a public relations consultant if the **Insured** reasonably considers that action is needed in order to avert or mitigate a **Business Income Loss** or **Media Event**;



**Cyber Extortion Threat**

A credible threat or series of credible threats, that includes a demand for **Extortion Payment**, to:

a. Release, disseminate, destroy or corrupt the **Insured's Digital Assets**;
b. Introduce **Malicious Code** into the **Insured's Computer System**;
c. Corrupt, damage or destroy the **Insured's Computer System**;
d. Electronically communicate with the **Insured's** customers and falsely claim to be the **Insured** or to be acting under the **Insured's** direction in order to falsely obtain personal confidential information of the **Named Insured's** customers (also known as "pharming," "phishing," or other types of false communications); or
e. Restrict or hinder access to the **Insured's Computer System**, including the threat of a criminal or malicious **Denial of Service**;

**Damages**

The amount an **Insured** is legally obligated to pay in respect of: a **Claim**, including a monetary judgement, award or settlement, interest and a claimant's legal costs; punitive and exemplary damages, to the extent such damages are insurable under the law pursuant to which this **Policy** is construed; **Regulatory Fines and Penalties** only to the extent covered by Insuring Agreement I. B. Regulatory Investigations, Fines, and Penalties; and PCI DSS Assessment Expenses only to the extent covered by Insuring Agreement I. D.; **Damages** shall not include:

a. Future profits or royalties, restitution, or disgorgement of the **Insured's** profits;
b. The cost of complying with orders granting injunctive or non-monetary relief, including specific performance, or any agreement to provide such relief;
c. Loss of the **Insured's** fees or profits, return or offset of the **Insured's** fees or charges (invoiced or not), or the **Insured's** commissions or royalties provided or contracted to be provided;
d. Fines, taxes or loss of tax benefits, sanctions unless covered under Insuring Agreement I.B. Regulatory Investigations, Fines, and Penalties and unless covered under Insuring Agreement I.D. Payment Card Industry Fines, Assessments and Expenses;
e. Liquidated damages to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement, unless covered under Coverage I.D. Payment Card Industry Fines, Assessments and Expenses;
f. Any amount which the **Insured** is not legally obligated to pay; and
g. Amounts which are uninsurable under the law pursuant to which this **Policy** is construed;



**Data**

Information represented, transmitted or stored electronically, or digitally including code, or a series of instructions, operation systems program, software and firmware;

**Defense Expenses**

Reasonable and necessary: fees charged by an attorney to defend a **Claim**, and costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** incurred with the **Company's** prior written consent, or such fees and costs incurred by an attorney from the Pre-Approved Vendors specified on the Declarations page;

**Denial of Service**

Unauthorized interference or malicious attack that restricts or prevents access to the **Insured's Computer System** for entities authorized to gain access;

**Digital Asset Loss**

Expenses incurred to restore, recreate, or replace **Digital Assets** or **Computer Systems** directly impacted by a **Privacy Breach** or **Security Breach**. If it is determined that **Digital Assets** or a **Computer System** cannot be restored, recreated, or replaced, the **Company** will only reimburse the **Insured's** losses or expenses incurred up to the date of such determination;

**Digital Assets**

The **Insured's** digital files including **Data**, computer programs, electronic documents and audio content stored by the **Insured's Computer System**;

**E-Media**

Hard drives, CD ROMs, magnetic tapes, magnetic discs or any other media on which electronic **Data** is stored;

**Employee**

Any individual whose labor or service is engaged by and directed by the **Insured**, including volunteers and part-time, seasonal, temporary or leased workers, and independent contractors;

**Extra Expenses**

Reasonable and necessary extra costs incurred by the **Insured** to temporarily continue as nearly normal as practicable in the conduct of the **Insured's** business during the **Interruption Period**, less any value remaining at the end of the **Interruption Period** for property or services obtained in connection with such costs; "Normal" shall mean the condition that would have existed had no **Privacy Breach**, **Security Breach**, **Administrative Error** or **Power Failure** occurred;

**Extortion Expenses**

Reasonable and necessary expenses incurred to avoid a **Privacy Breach**, **Security Breach** or the disruption failure of the **Insured's Computer System**, resulting directly from a **Cyber Extortion Threat**;



**Extortion Payment**

The payment of a ransom demand to avoid a **Privacy Breach**, **Security Breach** or the disruption or failure of the **Insured's Computer System**, resulting directly from a **Cyber Extortion Threat**. The **Insured** must report any payments to legal or federal law enforcement authorities.

**Financial Fraud**

a. An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution, directing such institution to debit the **Insured's** account and to transfer, pay or deliver money or securities from the **Insured's** account, which instruction purports to have been transmitted by the **Insured**, an **Executive**, or an **Employee**, but was in fact fraudulently transmitted by a **Third Party** without the **Insured's** knowledge or consent; or

b. An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution by an **Executive** or **Employee** as a result of that **Executive** or **Employee** receiving intentional, misleading or deceptive telephonic or electronic communications from a **Third Party** falsely purporting to be the **Insured** or the **Insured's** client, vendor, **Executive** or **Employee**, and which directs the financial institution to debit the **Insured's** account and to transfer, pay or deliver money or securities from the **Insured's** account; or

c. The theft of money or securities from the **Insured's** bank account or corporate credit cards by electronic means;

**Financial Fraud Loss**

**Insured's** loss of money, securities, or **Specified Property** which is directly caused by **Financial Fraud**;

**Financial Fraud Loss** does not include any amounts reimbursed to the **Insured** by any financial institution;

**Funds Held In Escrow**

Money or securities belonging to a **Third Party**;

**Insured**

a. The entity specified in Item 1 of the Declarations Page;

b. Any **Subsidiary** but only during the time period such qualifies as a **Subsidiary**;

c. Any past, present or future officer, director, trustee, court-appointed receiver, or **Employee** of any of (a) and (b) above, but only while acting solely within the scope of their duties as such;

d. Any general or managing partner, principal, stockholder, or owner of any of (a) and (b) above, but only while acting solely within the scope of their duties as such;



e. Any legal entity required by contract to be named as an **Insured** under this **Policy** if agreed in advance and in writing by the **Company**, but only for the acts of any above parties (a) through (d), as detailed under the Insuring Agreements purchased;

f. Any agent or independent contractor, including distributors, licensees, and sublicensees, but only while acting on behalf of, at the direction of, or under the control of any party of (a) through (2) above; however, not including any **Outsourced Service Provider**;

**Interruption Period**

Under Insuring Agreement II. A. Business Interruption, Insuring Agreement II. B. Contingent Business Interruption, and Insuring Agreement II. D. System Failure, the period of time that commences when the partial or complete interruption, degradation or failure of the **Computer System** begins, and ends on the earlier of:

a. The date of full system restoration of the **Computer System** plus up to 30 days thereafter if necessary to allow for restoration of the **Insured's** business; or

b. The maximum Period of Indemnity as stated in Item 6 of the Declarations Page;

Under Insuring Agreement II. D. Reputational Loss, the period of time that commences on the date of the earliest **Media Event** and ends after the maximum indemnity period as stated in Item 6 of the Declarations Page;

**Loss**

**Breach Management and Incident Response Expenses**, **Crisis Management Expenses**, **Digital Asset Loss**, **Extortion Expenses**, **Extra Expenses**, **Extortion Payment**, **Business Income Loss**, **Financial Fraud Loss**, **Phishing Attack Loss**, **Related Expenses**, **Telecommunications Fraud Loss**, and theft of **Funds Held In Escrow**;

**Malicious Code**

Software intentionally designed to damage **Digital Assets** or a **Computer System** by a variety of forms including, but not limited to, virus, worms, Trojan horses, spyware, dishonest adware, ransomware and crimeware;

**Media Activities**

The release or display of any **Media Material** that is under the direct sole control of the **Insured** and directly results in any of the following:

a. Defamation, libel, slander, product disparagement or trade libel;

b. Infringement, interference, or invasion of an individual's right or privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of likeness, and public disclosure of private facts;

c. Plagiarism, piracy, or misappropriation of ideas under an implied contract;



d.  Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service names; or

e.  Domain name infringement or improper deep-linking or framing;

**Media Event**

A report in the media of a **Privacy Breach** or **Security Breach** including via newspapers, radio, television, internet, blogging, and social media that has an adverse impact on the **Insured's** business or reputation;

**Media Material**

Communicative material of any kind or nature for which the **Insured** is responsible, including, but not limited to, words, pictures, sounds, images, graphics, code and **Data**, regardless of the method or medium of communication of such material or the purpose for which the communication is intended. **Media Material** does not include any tangible goods or products that are manufactured, produced, processed, prepared, assembled, packaged, labeled, sold, handled or distributed by the **Insured** or others trading under the **Insured's** name;

**Named Insured**

The entity listed in Item 1 of the Declarations page;

**Outsourced Service Provider**

An independent service provider that provides information technology services or business processing outsourcing services, including, but not limited to hosting, security management, colocation, call center services, fulfillment services, logistical support, and data storage, for the benefit of the **Insured** under a written contract with the **Insured**;

**Personal Funds**

Money, securities, or financial assets from a personal bank account belonging to the **Control Group**;

**PCI DSS Assessment Expenses**

Payment Card Industry forensic investigation costs, fines or penalties, assessments, including fraud loss recoveries and card replacement costs, and administrative costs that the **Insured** is legally obligated to pay under the terms of a Merchant Services Agreement as a result of the **Insured's** actual or alleged non-compliance with Payment Card Industry Data Security Standards. **PCI DSS Assessment Expenses** does not include any ongoing obligation or audit following the imposition of an assessment, fine or penalty;

**Phishing Attack**

The use of fraudulent electronic communications or malicious websites to impersonate the **Insured**, the **Insured's** brand, or any of the **Insured's** products or services, in order to solicit **Protected Personal Information**;



**Phishing Attack Loss**

a. Expenses the **Insured** incurs, with the **Company's** prior written consent, to create and issue a specific press release or to establish a specific website to advise the **Insured's** customers and prospective customers of a **Phishing Attack**; and

b. The cost of reimbursing the **Insured's** existing customers for their losses arising directly from a **Phishing Attack**;

c. The cost of reimbursing the **Insured's** existing customers for their financial loss arising directly from the fraudulent communications;

d. **Insured's** direct loss of profits for 120 days following the **Insured's** discovery of the fraudulent communications as a direct result of the fraudulent communications;

e. External costs associated with the removal of websites designed to impersonate the **Insured**;

**Policy** or **Insurance**

This contract of insurance including the **Application**, any Declarations and Declarations Pages, and any endorsements or variations, all material to and forming part hereof;

**Policy Period**

The period of time between the Inception Date and Time and the Expiration Date and Time specified in Item 2 of the Declarations unless terminated earlier, and specifically excluding any Extended Reporting Period;

**Power Failure**

Failure in electrical power supply caused by a **Security Breach**, but only where such power is under the direct operational control of the **Insured** or the equipment necessary to supply the power is under the direct operational control of the **Insured**;

**Privacy Breach**

a. A breach of confidentiality, or infringement or violation of any right to privacy, or a breach of the **Named Insured's** privacy policy or of **Privacy Regulations**; or

b. An accidental release, unauthorized disclosure, loss, theft or misappropriation of **Protected Personal Information** or confidential corporate information in the care, custody or control of an **Insured** Entity or **Outsourced Service Provider**;



**Privacy Regulations**

Statutes, laws and regulations associated with the confidentiality, access, controls and use of personally identifiable, non-public information, including:

a. Health Insurance Portability and Accountability Act of 1996 (Public Law 104- 191);
b. Gramm-Leach-Bliley Act of 1999, also known as the Financial Services Modernization Act of 1999;
c. State and federal statutes and regulations regarding the security and privacy of consumer information;
d. Governmental privacy protection regulations, statutes, or laws associated with the control and use of personal information;
e. Privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act;
f. Children's Online Privacy Protection Act;
g. The EU Data Protection Act or other similar privacy laws worldwide;

**Protected Personal Information**

With respect to natural persons, any private, non-public information of any kind in an **Insured's** care, custody, or control, regardless of the nature or form of such information, including but not limited to the following, but only if such information allows an individual to be uniquely identified:

a. Social security number;
b. Medical service or healthcare data;
c. Driver's license or state identification number;
d. Equivalents of any of the information listed in a.-c. above;
e. Account, credit card, or debit card number, alone or in combination with any information that permits access to an individual's financial information, including, but not limit to, security or access code or password; and
f. Other-non-public information to the extent prescribed under **Privacy Regulations**;

However, **Protected Personal Information** does not mean publicly available information that is lawfully in the public domain or information available to the general public from government records;



**Regulatory Fines and Penalties**

Civil fines, monetary penalties payable or a monetary amount which the **Insured** is legally obligated to deposit in a fund as equitable relief as imposed by a governmental agency or regulatory authority as a result of a breach of the **Privacy Regulations**;

**Related Expenses**

Reasonable and necessary costs and expenses the **Insured** incurs to:

a. Prevent, preserve, minimize, or mitigate any further damage to **Digital Assets**, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts;

b. Preserve critical evidence of any criminal or malicious wrongdoing;

c. Purchase replacement licenses for computer programs because the copy protection system or access control software was damaged or destroyed by a **Loss**; or

d. Notify affected individuals of a total or partial interruption, degradation in service, or failure of an **Insured's Computer System** resulting from a **Loss**;

**Reputational Loss**

Provable and determinable **Business Income Loss** during the **Interruption Period**;

Reputational Loss shall not mean, and no coverage shall be available for, any of the following:

a. Loss arising out of any liability to a **Third Party**;

b. Legal costs or legal expenses of any type;

c. Loss incurred as a result of unfavorable business conditions, loss of market or any other consequential loss;

d. Loss, liability, or expense incurred in connection with a **Media Event** that also affects or refers in similar terms to a general security issue, an industry, or the **Insured's** specific competitors without any specific allegations regarding a **Security Breach**, **Privacy Breach**, **Extortion Threat**, or **Phishing Attack** committed by an **Insured**, or by others acting on your behalf, for whom you are legally responsible, including **Outsourced Service Providers**;

e. Costs or expenses the **Insured** incurs to identify, investigate, respond to or remediate a **Privacy Breach**, **Security Breach**, **Extortion Threat** or **Phishing Attack**;



**Retention**

The figures specified in Item 6 of the Declarations Page that is payable by the **Insured** in respect of every **Claim** and **Loss**;

**Security Breach**

a. The use of the **Computer System** by an unauthorized person or persons, or by an authorized person in an unauthorized manner, including social engineering techniques;

b. A **Denial of Service** attack or DDoS attack;

c. Transmission of **Malicious Code**;

d. The failure to prevent or hinder participation in a **Denial of Service** attack from a **Computer System**;

A series of continuing **Security Breaches**, or related or repeated **Security Breaches** arising from the same sequence of events, shall be considered a single **Security Breach** and be deemed to have occurred at the time of the first such **Security Breach**;

**Specified Property**

Any tangible property, other than money or securities, which has intrinsic value;

**Subsidiary**

Any corporation, limited liability company, or partnership while more than 50% of the outstanding voting securities or shares that represent the present right to vote for the election or appointment or designation of such entity's directors, managers or equivalent are directly owned or controlled by the **Insured**; or any joint venture while the **Named Insured** has managerial control, or while it has the right to elect or designate or otherwise appoint or directly control the appointment of more than 50% of such entity's directors, trustees, managers or equivalent;

**Telecommunications Fraud**

The intentional, unauthorized and fraudulent gaining of access to outgoing telephone service through infiltration and manipulation of an **Insured Telecommunications System**;

**Telecommunications Fraud Loss**

Charges the **Insured** incurs for unauthorized calls directly resulting from **Telecommunications Fraud**;



**Telecommunications Systems**

Any telephone network or system that the **Insured** owns, rents, licenses, or borrows.

**Third Party**

Any person who is not an **Employee** or any legal entity that is not the **Insured**.

**Unintentional Damage or Destruction**

a. Accidental physical damage to, or destruction of, **E-Media** so that stored **Digital Assets** are no longer machine-readable; Accidental damage to, or destruction of, computer hardware so that stored **Data** is no longer machine- readable;

b. Failure in power supply or under/over voltage, but only if such power supply, including back-up generators, is under the **Insured's** direct operational control;

c. Electrostatic build-up and static electricity.

**Waiting Period**

Under Insuring Agreement II. A. Business Interruption and Insuring Agreement II. B. Contingent Business Interruption, the period of time that commences when the partial or complete interruption, degradation or failure of the **Computer System** begins, and expires after the number of hours specified in Item 6 of the Declarations Page. Under Insuring Agreement II. F. Reputational Loss, the period of time that commences when the **Media Event** occurs and expires after the number of hours specified in Item 6 of the Declarations Page. **Business Income Loss** incurred during the **Waiting Period** is uninsured.



## CLAIMS CONDITIONS

1. **Subrogation**

    If any payment is made under this **Policy**, the **Insured** shall maintain all rights of recovery against any **Third Party**. The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights, and shall do nothing to prejudice such rights. Any recoveries shall be applied first in payment of the **Company's** subrogation expenses, secondly to **Loss**, **Damages**, **Defense Expenses**, or any other amounts paid by the **Company**, thirdly to any uninsured amount, and lastly to the **Retention**. Any additional amounts recovered shall be paid to the **Insured**.

2. **Notice of Claim, Loss or Circumstance**

    a. If, during the **Policy Period**, the **Control Group** becomes aware of a **Claim** or **Loss**, the **Insured** must forward details to the **Company** as soon as practicable during the **Policy Period** or the Extended Reporting Period, if applicable, through the persons named in the Declarations Page. The **Insured** must report a **Claim** or **Loss** regardless of whether the **Claim** or **Loss** arises out of any previously reported incident, circumstances, acts, errors or omissions, or related **Claim** or **Loss**.

    b. If during the **Policy Period**, the **Control Group** becomes aware of any incidents, circumstances, acts, errors or omissions that could reasonably result in a **Claim** or **Loss**, the **Insured** must forward details to the **Company** as soon as practicable during the **Policy Period** through the persons named in the Declarations Page. Any **Claim** or **Loss** arising out of such reported incidents, circumstances, acts, errors or omissions will be deemed to have been made or incurred when the **Company** first received notice complying with this paragraph.

    c. Any **Loss**, **Claim** or incidents, circumstances, acts, errors or omissions that could reasonably result in **Loss** or a **Claim** shall be considered properly reported to the **Company** when notice is first given, as specified under Item 4 of the Declarations page.

3. **Dispute Resolution**

    a. No legal action shall be instituted by any **Insured** against the **Company** in any court in respect of any alleged **Defense Expenses** or indemnity payable by the **Company** in respect of any **Claim** unless, as a condition precedent thereto, there has been full compliance with all the terms of the **Policy** and the amount of the **Insured's** obligation to pay the relevant **Third Party Claim** shall have been finally determined by judgement or award against the **Insured** after actual trial or arbitration, or by written agreement of the **Insured**, the claimant and the **Company**.

    b. Any person or organization of the legal representative thereof who has secured such judgement, award, or written agreement shall thereafter be entitled to make a **Claim** under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or organization shall have any right under this policy to join the **Company** as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability,



nor shall the **Company** be impleaded by the **Insured** or the **Insured's** legal representative. Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the **Company** of their obligations hereunder.

c. Mediation. If any dispute arises between any **Insured** and the **Company** involving **Loss** or a **Claim** under this **Policy**, such dispute shall be referred by the parties to a qualified mediator to negotiate a resolution of the dispute in good faith, prior to the initiation of any arbitration or other judicial proceedings. The party electing to mediation shall provide written notice to other party of its request to mediate with a brief statement regarding the issue to be mediated. The **Named Insured** is authorized and directed to accept such Notice of Mediation on behalf of any **Insured**.

d. In the event that non-binding Mediation does not resolve or settle the dispute between any **Insured** and the **Company**, after 30 days from the date of the Mediation, either party may:

    (1) commence a judicial proceeding; or

    (2) seek agreement to submit the matter to final and binding arbitration before either a single mutually agreed arbitrator or a three arbitrator panel whereby the **Insured** selects one arbitrator, the **Company** select one arbitrator and the two selected arbitrators agree upon the selection of the third arbitrator.

Defense, Settlement and Investigation of Claims

a. The **Company** shall have the right and duty to defend any **Claim** against the **Insured**, even if any of the allegations of the **Claim** are groundless, false, or fraudulent, subject to the Limit of Liability, Exclusions and other terms and conditions of this **Policy**.

b. Unless defense counsel or breach counsel is chosen from the list of PreApproved vendors specified on the Declarations Page, defense counsel or breach counsel shall be appointed with the **Company's** prior written consent. Such consent shall not be unreasonably withheld. However, in the absence of agreement the **Company's** decision shall be final.

c. The **Company** shall have the right to make any investigation they deem necessary including with respect to the **Application** or to coverage.

d. If the **Insured** refuses to consent to a settlement that the **Company** recommends, and that the claimant will accept, the **Insured** must then defend, investigate or settle the **Claim** at the **Insured's** own expense. As a consequence of the refusal to settle as per **Company's** recommendation, **Company's** liability for any **Claim** shall not be more than the amount of the initial recommended settlement plus up to 70% of any additional costs incurred by the **Insured** above this amount in order to settle this matter, subject always to the limit of the Policy.



e. No **Insured** may incur any **Defense Expenses**, **PCI DSS Assessment Expenses**, or admit liability for, or settle, any **Claim**, without the **Company's** written consent, which shall not be unreasonably withheld. Provided that, if a proposal settlement amount, when combined with any **Defense Expenses** or **PCI DSS Assessment Expenses** incurred, does not exceed 50% of the applicable **Retention** set forth in the Declarations Page, the **Insured** may settle a **Claim**, or accept an offer of settlement, without the prior written consent of the **Company**. Such settlement must fully resolve the **Claim** with respect to the **Insured** and the **Company**.

## GENERAL CONDITIONS

The **Company** has no duty to provide coverage under this Policy unless there has been full compliance with all the conditions contained in this Policy. Any clause designated as a condition precedent shall require the entity to which it applies to comply specifically and completely with it and any breach or failure to do so shall entitle the **Company** to reject all or part of the **Claim**, **Damages**, **Defense Expenses** or **Loss** or any related **Claim** or **Loss** whether or not such breach or failure causes loss, prejudice or damage.

1. **Policy Limits**

   The Aggregate Limit specified in Item 5 of the Declarations Page shall be the maximum liability of the **Company** under this **Policy**. The sublimits for each Insuring Agreement specified in Item 5 of the Declarations Page form part of, and are not in addition to, such Aggregate Limit.

   After the **Policy** Limit of Liability has been exhausted, the **Company** has no obligations to pay any **Damages**, **Defense Expenses**, **Loss** or any other amounts under the **Policy**, and shall have the right to withdraw from the defense.

2. **Retention and Waiting Period**

   The **Retention** amount specified in Item 5 of the Declarations Page for each Insuring Agreement apply separately to each and every **Loss** and **Claim** and shall be satisfied in full by the **Insured's** monetary payments of **Loss**, **Damages**, or **Defense Expenses**.

   The **Company** shall only be liable for amounts in excess of the **Retention**, subject to the Limit of Liability.

   For Insuring Agreements subject to a **Waiting Period**, the **Company** will only become liable for any **Loss** upon expiration of the applicable **Waiting Period**. Any Loss incurred during the **Waiting Period** is uninsured.

   In the event of a **Claim** or **Loss** attaches to more than one Insuring Agreement, only the highest **Retention** or the longer **Waiting Period** will apply to that **Claim** or **Loss**.



The **Insured's** payment of the applicable **Retention** is a condition precedent to the payment by the **Company** of any amounts covered under the **Policy**. The **Insured** shall make direct payments within the **Retention** to the appropriate parties as designated by the **Company**.

3. **Related Claims and Loss**

   All **Claims** and **Loss** arising out of the same related or continuing acts, facts, circumstances or events shall be considered a single **Claim** or **Loss**, without regard to the number of **Insureds**, **Claims** or claimants. All such **Claims** or **Loss** shall be deemed to have been made at the time of the first such **Claim** or **Loss**.

4. **Cancellation**

   If this **Policy** is cancelled by the **Named Insured**, the **Company** will refund the unearned premium computed at the **Company's** short rate then in force. No premium will be refunded where any **Claim** or circumstance has been notified under this **Policy**, whether or not it has been accepted for coverage.

5. **Other Insurance**

   This **Policy** is excess to any other valid and collectible insurance (or other indemnity) available to the **Insured**.

6. **Inspection and Audit**

   The **Company** shall be permitted, but not obligated, to inspect any of the **Insured's** property, operations, or records and take copies of same at any time at the **Insured's** cost.

7. **Mergers and Acquisitions**

   If any **Named Insured** completes the legal acquisition of another entity during the **Policy Period**, then that acquired entity will automatically be included as an **Insured** but only with respect to **Claims** or **Loss** sustained or occurring after the date of the acquisition and otherwise qualifying for coverage under this **Policy**, unless:

   a. That acquired entity has an annual revenue of more than 20% of the **Named Insured's** annual revenue (evaluated according to the last set of audited accounts formally filed by that entity against the information provided by the **Named Insured** when applying for this **Policy**); or

   b. Unless that acquired entity stores a total number of unique, personally identifiable records that are in excess of 20% of the total unique, personally identifiable records that the **Named Insured** stores (as at the date of completion of such acquisition).

   If the above cover is not automatically provided to the newly acquired entity, to obtain cover the **Named Insured** must notify and obtain the written consent of the **Company** prior to the acquisition, and agree to pay any additional premium required.



8. **Assignment**

The interest hereunder is not assignable by any qualifying **Insured**.

9. **Innocent Insured**

a. Whenever coverage under this **Policy** would be excluded, suspended, or lost owning to non-compliance with **Claims** Conditions 2. Notice of claim or circumstance, with respect to which any other **Named Insured** shall be in default solely as a result of such non-compliance, then such insurance as would otherwise be afforded under this **Policy** shall cover and be payable to those **Insureds** who did not personally commit or personally participate in committing or personally acquiesce in such failure to give notice, provided that **Insured** entitled to the benefit of this provision shall comply with **Claims** Conditions 2. Notice of **Claim** or Circumstance promptly after obtaining knowledge of the failure of any other **Insured** to comply therewith.

Any insurance afforded by this provision shall not cover a **Claim** if a member of the **Control Group** knew or should reasonably have known of a **Claim** or circumstance that could reasonably form the basis of a **Claim** or **Loss** and failed to give notice as required by **Claims** Conditions 2.

Notwithstanding the above, the reporting of any such **Claim** or **Loss** must be made during the **Policy Period** or Extended Reporting Period, if applicable.

b. Whenever coverage this **Policy** would be excluded, suspended, or lost because of the Insured Misconduct Exclusion, then such insurance as would otherwise be afforded under this **Policy** shall converge and be payable with respect to those **Insureds** who did not personally commit, personally participate in committing, personally acquiesce, or remain passive after having personal knowledge thereof, provided that the **Insured** entitled to the benefit of this provision shall comply with **Claims** Conditions 2. Notice of **Claim** or Circumstance promptly after obtaining knowledge of the failure of any other **Insured** to comply therewith.

10. **Extended Reporting Period**

a. Automatic Extended Reporting Period

The **Named Insured** shall have a period of sixty (60) days following the end of the **Policy Period** in which to give written or electronic notice to the **Company** of any **Claim** or **Loss**, but only in respect of any:

I. **Claim** first made during the **Policy Period** or Automatic Extended Reporting Period when such **Claim** is based upon a **Security Breach**, **Privacy Breach** or **Media Activity** prior to the end of the **Policy Period** or

II. Loss based upon a **Security Breach**, **Privacy Breach**, **Administrative Error**, **Power Failure**, **Unintentional Damage or Destruction**, **Computer Crime and Computer Attacks**, **Financial Fraud**, **Telecommunications Fraud**, **Phishing Attack** or **Cyber Extortion Threat** during the **Policy Period** when first discovered by the **Control Group** during the **Policy Period** or Automatic Extended Reporting Period and which is otherwise covered by this **Policy**.



b. Optional Extended Reporting Period

In the event of cancellation or non-renewal of this **Policy**, the **Named Insured** shall have the right to purchase an Optional Extended Reporting Period for additional premium, as stated in Item 8 of the Declarations Page. Once purchased, the premium for the Extended Reporting Period will be deemed fully earned. The **Company** must receive the **Named Insured's** request for the Optional Extended Reporting Period by written or electronic notice within thirty (30) days of such cancellation or non-renewal that it requires, and the **Company** shall provide, an Optional Extended Reporting Period commencing at the end of the **Policy Period** in which to give written or electronic notice to the **Company** of any:

I. **Claim** first made during the **Policy Period** or Optional Extended Reporting Period when such **Claim** is based upon a **Security Breach**, **Privacy Breach** or **Media Activity** prior to the end of the **Policy Period**, or

II. Loss based upon a **Security Breach**, **Privacy Breach**, **Administrative Error**, **Power Failure**, **Unintentional Damage or Destruction**, **Computer Crime and Computer Attacks**, **Financial Fraud**, **Telecommunications Fraud**, **Phishing Attack** or **Cyber Extortion Threat** during the **Policy Period** when first discovered by the **Control Group** during the **Policy Period** or Optional Extended Reporting Period and which is otherwise covered by this **Policy**. The payment of the additional premium for the Optional Extended Reporting Period must be paid to the **Company** within thirty (30) days of the non-renewal or cancellation.

c. The Limit of Liability for any Extended Reporting Period shall be part of, and not in addition to, the Limit of Liability for the **Policy Period**.

d. The right to any Extended Reporting Period shall not be available to the **Insured** where cancellation or non-renewal by the **Company** arises through non-payment of premium or the **Insured's** failure at any time to pay amounts within the applicable **Retention**.

11. **Change of Control**

In the event of the **Named Insured's** acquisition by or merger into another entity, or the **Named Insured's** liquidation or dissolution, the **Named Insured** may notify the **Company** within sixty (60) days of the actual change of control of the **Named Insured's** election for an Extended Reporting Period of twelve (12) months from the date of such change of control. Such Extended Reporting Period shall cover **Claims** reported or **Loss** notified to the **Company** during this change of control Extended Reporting Period, but only in respect of any **Claim** made during the **Policy Period** or **Loss** incurred during the Policy Period which is otherwise covered by this **Policy**.



12. **Assistance and Cooperation**

   a. The **Insured** shall cooperate with the **Company** in all investigations relating to this **Policy**. The **Insured** shall execute or cause to be executed all documents and papers and render all assistance as requested by the **Company**, including providing copies of a **Third Party's** system security and event logs.

   b. Upon the **Company's** request, the **Insured** shall assist in making settlements, in the conduct of all third party dispute resolution procedures and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** with respect to which insurance is afforded under this **Policy**, and the **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses at the **Insured's** own cost.

   c. It is a condition precedent to the **Company's** liability that the **Insured** shall not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgement or award, or dispose of any **Claim** without the **Company's** prior written consent. However, the prompt public admission of a **Privacy Breach** potentially impacting non-public personally identifiable information as required by governmental privacy legislation or credit card association operating requirements will not be considered as an admission of liability requiring the **Company's** prior consent.

   d. The **Company** shall have the right to make any investigation they deem necessary with respect to coverage including the **Application**.

   e. The **Insured** shall submit for examination under oath by the **Company's** representative, if requested, in connection with all matters relating to this **Policy**.

13. **Warranty by the Named Insured**

   By acceptance of this **Policy**, all **Insureds** agree that the statements in the **Application** are their agreements and representations, which shall be deemed material to the risk, and that this **Policy** is issued in reliance upon the truth thereof. The misrepresentation or non-disclosure in the **Application** of any material matter by the **Insured** or its agent will render the **Policy** null and void and relieve the **Company** from all liability under the **Policy**.

14. **Forfeiture**

   Any:

   a. Action or failure to act by the **Insured** with the intent to defraud the **Company**; or

   b. Material misrepresentation or non-disclosure of any material fact or claims by the **Insured** in the **Application** or in any supplemental materials submitted to the **Company**:

   Shall render this **Policy** null and void, and all coverage hereunder shall be forfeited.



15. **Construction and Interpretation**

    a. Any reference to legislation, statute, regulation or law includes any similar or related law, statute, ordinance, or regulation, any amendments, and any rules or regulations or executive orders promulgated thereunder, or by a federal, state, local or other agencies or similar bodies thereof. Any reference to a regulatory or investigative or other state or local governmental body includes any similar, subsidiary or related agency or body.

    b. All or part of any provision of this **Policy** which is or becomes void or illegal, invalid or unenforceable by a court or other competent body under the law of any applicable jurisdiction shall be deleted. The parties shall use their best efforts to agree a replacement for the provision deleted which achieves as far as possible the same effect as would have been achieved by the deleted provision had it remained enforceable.

16. **Coverage Territory**

    Coverage under this **Policy** applies anywhere in the world.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Breach Response and Remediation Expenses Outside the Limit

In consideration of the premium charged, it is hereby understood and agreed that the Limit of Liability applicable to Insuring Agreement II. H. Breach Response and Breach Remediation Expenses, as set forth in Item 6 B. of the Declarations, shall be deemed to be separate from, and in addition to, the Maximum Policy Aggregate Limit of Liability set forth in Item 6 C. of the Declarations. It is further understood and agreed that any payments made under Insuring Agreement II. H. will not reduce or erode the Maximum Policy Aggregate Limit of Liability.

This endorsement is to take effect on: **04/01/2019**

Policy Number: **CYB-1002552-00**

Policy Inception Date: **04/01/2019**

Policy Expiration Date: **04/01/2020**

Endorsement Number: **CB-108-001**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Defense Expenses Outside the Limit

In consideration of the premium charged, it is hereby understood and agreed that the Policy to which this Endorsement attaches is amended as follows:

It is understood and agreed that there will be a separate limit of liability for **Defense Expenses** as follows:

a. The **Defense Expenses** Limit of Liability is $1,000,000 each claim and $1,000,000 in the aggregate.

b. The **Defense Expenses** Limit of Liability set forth in paragraph a. above will apply to **Defense Expenses** only and will be the first limit of liability applied to **Defense Expenses**. In no event will the **Defense Expenses** Limit of Liability apply to **Damages** or any other amounts covered under this Policy, other than **Defense Expenses**. **Defense Expenses** that exceed the **Defense Expenses** Limit of Liability will be subject to and will reduce the Limits of Liability applicable to Third Party Insuring Agreements I.A., B, or C, whichever applies.

c. If purchased, the Limits of Liability applicable to Insuring Agreement I. A, B, C or D, as set forth in Item 5 of the Declarations, will apply to (a) **Damages, Regulatory Fines and Penalties** or **PCI DSS Assessment Expenses** covered under Insuring Agreement I. A, B, C, or D, whichever applies and (b) **Defense Expenses** that exceed the **Defense Expenses** Limit of Liability.

d. In no event will the **Company** be obligated to pay more than the Limits of Liability applicable to Insuring Agreement I. A, B, C, or D for **Damages, Regulatory Fines and Penalties** or **PCI DSS Assessment Expenses** covered under Insuring Agreement I. A, B, C, or D whichever applies.

e. In no event will the **Company's** obligations under this **Policy** exceed the combined limits of the aggregate Defense Expenses Limit of Liability set forth in paragraph a. above plus the Maximum Policy Aggregate Limit of Liability set forth in Item 6(C) of the Declarations plus any additional limits of liability added by endorsement to this Policy that may not reduce or erode the Maximum Policy Aggregate Limit of Liability. References in this Policy to "Maximum Policy Aggregate Limit of Liability" will refer to the combination of such Limits of Liability, subject to the limitations in this endorsement.

f. Nothing in this endorsement will alter the **Retention** obligations of the **Insured**.



This endorsement is to take effect on: **04/01/2019**
Policy Number: **CYB-1002552-00**
Policy Inception Date: **04/01/2019**
Policy Expiration Date: **04/01/2020**
Endorsement Number: **CB-109-001**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# GDPR Coverage

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended as follows:

The following Insuring Agreement is added to the **Policy**, under Third Party Insuring Agreements:

I. Amounts which the **Insured** is legally obligated to pay as a direct result of a **Claim** first made against the **Insured** during the **Policy Period**, and reported in writing or by electronic notice to the **Company** during the **Policy Period** or Extended Reporting Period, if applicable, for:

**General Data Protection Regulation**

**Damages**, **Regulatory Fines and Penalties** and **Defense Expenses** which the **Insured** is legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** for a violation of the EU General Data Protection Regulation (or legislation in the relevant EU jurisdiction implementing this Regulation) arising from a **Security Breach** or **Privacy Breach**.

With respect to the General Data Protection Regulation Insuring Agreement, the definition of **Claim** is amended to include a request for information or institution of a regulatory proceeding against any **Insured** under the General Data Protection Regulation Insuring Agreement for a violation of the EU General Data Protection Regulation (or legislation in the relevant EU jurisdiction implementing this Regulation).

Exclusion 21. Anti-Trust Laws and Unfair Competition will not apply to the General Data Protection Regulation insuring agreement, provided no member of the **Control Group** participated or colluded in the activities or incident giving rise to coverage under such insuring agreement.

Exclusion 10. Government Intervention will not apply to the General Data Protection insuring agreement.

This endorsement is to take effect on: **04/01/2019**
Policy Number: **CYB-1002552-00**
Policy Inception Date: **04/01/2019**
Policy Expiration Date: **04/01/2020**
Endorsement Number: **CB-111-002**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Reliance Endorsement

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended as follows:

Definitions, Application is deleted in its entirety and replaced with the following: **Application** means the following application(s):

Chubb including any attachments thereto, and all other information and materials submitted to the Underwriters or their representative(s) by, or on behalf of, the **Named Insured** in connection with the underwriting and issuance of this **Policy** or a policy for which this **Policy** is a renewal or replacement. All of the above are deemed attached to and incorporated into this **Policy** and operate as **Underwriters'** own application.

This endorsement is to take effect on: **04/01/2019**
Policy Number: **CYB-1002552-00**
Policy Inception Date: **04/01/2019**
Policy Expiration Date: **04/01/2020**
Endorsement Number: **CB-113-001**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Solicitation Claims Endorsement

In consideration of the premium charged, it is hereby understood and agreed that the Policy to which this endorsement attaches is amended as follows:

1. General Conditions **Policy Limits** is amended by the addition of the following:

    Any **Solicitation Claim** will be subject to the sub-limits set forth below. The limits shown below will be the exclusive limits applicable to **Solicitation Claims**. Such sub- limits are part of, and will erode, the Limits of Liability set forth in Item 5.A. of the Declarations for the Network Security and Privacy Liability insuring agreement or the Regulatory Investigations, Fines and Penalties insuring agreement, whichever applies, and the Maximum Policy Aggregate Limit of Liability set forth in Item 6.C. of the Declarations.

    **Solicitation Claim** sublimit:

    $50,000 each **Solicitation Claim**

    $50,000 Aggregate

2. Definitions, **Privacy Regulations**, is amended to include the following:

    A. CAN-SPAM Act of 2003;

    B. Truth In Caller Act of 2009; and

    C. Telephone Consumer Protection Act of 1991.

3. Definitions is amended to include the following definition:

    **Solicitation Claim** means any **Claim** under the Network Security and Privacy Liability insuring agreement or Regulatory Investigations, Fines and Penalties insuring agreement for, based upon, arising from, in consequence of, or in any way involving any actual or alleged **Privacy Breach** in violation of the CAN-SPAM Act of 2003, the Truth In Caller Act of 2009, or the Telephone Consumer Protection Act of 1991, as amended, or any regulation promulgated under the foregoing statutes, or any federal, state, local or foreign laws similar to the foregoing statutes, whether such law is statutory, regulatory or common law.



This endorsement is to take effect on: **04/01/2019**

Policy Number: **CYB-1002552-00**

Policy Inception Date: **04/01/2019**

Policy Expiration Date: **04/01/2020**

Endorsement Number: **CB-120-001**

All other terms and conditions of the Policy remain unchanged.

 CORVUS

This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Criminal Reward Expenses Endorsement

In consideration of the premium charged, it is hereby understood and agreed that the Policy to which this endorsement attaches is amended as follows:

The **Company** will pay for the **Reward Expenses** up to the amount of $50,000 subject to an application retention of $10,000 incurred by the **Insured** and approved in writing in advance by the **Company**, but only if a written request for indemnification is made by a member of the **Control Group** to the **Company** in accordance with Claims Conditions, section 2. Notice of Claim, Loss or Circumstance.

**Reward Expenses** means the reasonable amount that the **Insured** pays to an **Informant** for information not otherwise available, and which leads to the arrest and conviction of any person who commits an illegal act that causes a **Loss**.

**Informant** means any person, other than a member of the **Control Group**, who provides information regarding an illegal act committed by another person which causes a **Loss**, solely in return for money that the **Insured** pays or promises to pay. **Informant** does not include: 1) any person who commits an illegal act which causes a **Loss**, whether acting alone or in collusion with others; 2) any **Insured**; 3) any **Insured**'s auditors, whether internal or external; 4) any person or firm hired or retained to investigate a **Loss**;

This endorsement is to take effect on: **04/01/2019**
Policy Number: **CYB-1002552-00**
Policy Inception Date: **04/01/2019**
Policy Expiration Date: **04/01/2020**
Endorsement Number: **CB-123-001**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Bricking Endorsement

In consideration of the premium charged, up to the amount of $100,000 subject to an applicable retention of $10,000, it is hereby understood and agreed that the Policy to which this endorsement attaches is amended as follows:

The definition of **Property Damage** is deleted in its entirety and replaced with the following:

**Property Damage**

Physical Injury to, or impairment, destruction or corruption of, any tangible property, including personal property in the care, custody or control of the Insured. **Data and Digital Assets** are not tangible property and are not **Property Damage**. **Property Damage** does not include the loss of use of electronic equipment caused by the reprogramming of the software (including firmware) of such electronic equipment rendering it useless for its intended purposes.

The definition of **Security Breach** is amended to include the following sentence to the end thereof:

e. The loss of use of all or part of a **Computer System** caused by the unauthorized reprogramming of software (including firmware) which renders such **Computer System**, or any component thereof, nonfunctional or useless for its intended purpose;

This endorsement is to take effect on: **04/01/2019**
Policy Number: **CYB-1002552-00**
Policy Inception Date: **04/01/2019**
Policy Expiration Date: **04/01/2020**
Endorsement Number: **CB-126-001**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Loss of Funds Exclusion Carveback

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended as follows:

Exclusions, exclusion #13 is deleted in its entirety and replaced with the following:

**13. Loss of Funds**

    a.  Loss, decrease in value or theft of securities or currency;

    b.  Trading losses, liabilities or changes in trading account value; or

    c.  The value of electronic funds, money, securities or wire transfer;

However, this exclusion does not apply to Insuring Agreement II.E. Social Engineering and Cyber Crime Coverage.

This endorsement is to take effect on: **04/01/2019**

Policy Number: **CYB-1002552-00**

Policy Inception Date: **04/01/2019**

Policy Expiration Date: **04/01/2020**

Endorsement Number: **CB-128-001**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.

SMART CYBER INSURANCE ENDORSEMENT

# Invoice Manipulation Loss

In consideration of the premium charged, up to the amount of $50,000 subject to an applicable retention of $10,000, it is hereby understood and agreed that the Policy to which this endorsement attaches is amended as follows:

**Clause II. E. Social Engineering and Cyber Crime Coverage** is amended to include:

**Invoice Manipulation Loss**

**Insured's Direct Net Loss** resulting directly from the **Insured's** inability to collect **Payment** for goods, products or services after such goods, products or services have been transferred to a **Third Party**, as a result of an **Invoice Manipulation Loss** that the **Insured** first discovers during the **Policy Period**:

**DEFINITIONS** is amended to include:

**Direct Net Loss** means the direct net cost to the **Insured** to provide goods, products or services to a **Third Party**. **Direct Net Loss** will not include any profit to the **Insured** as a result of providing such goods, products or services.

**Invoice Manipulation Loss** means the release or distribution of any fraudulent invoice or fraudulent payment instruction to a **Third Party** as a direct result of a **Security Breach** or a **Privacy Breach**.

**Payment** means currency, coins or bank notes in current use and having a face value.

This endorsement is to take effect on: **04/01/2019**

Policy Number: **CYB-1002552-00**

Policy Inception Date: **04/01/2019**

Policy Expiration Date: **04/01/2020**

Endorsement Number: **CB-133-001**

All other terms and conditions of the Policy remain unchanged.



This Endorsement changes the Policy. Please read it carefully.
SMART CYBER INSURANCE ENDORSEMENT

# Forensic Accounting Coverage

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended as follows:

1.  The definition of **Business Income Loss** is amended to include the following:

    c. **Forensic Accounting Costs;** provided however, that the **Company's** maximum liability for such costs shall be $50,000, which amount shall be part of, and not in addition to, the limit of liability for Insuring Agreement II. A Business Interruption and Insuring Agreement II. B. Contingent Business Interruption.

2.  **Forensic Accounting Costs** means those costs and expenses of establishing or proving an **Insured's Loss** under Insuring Agreement II. A Business Interruption and Insuring Agreement II. B. Contingent Business Interruption, including, without limitation, those connected with preparing a proof of loss. All loss described in this paragraph must be reported, and all proofs of loss must be provided, to the **Underwriters** no later than 6 months after the end of the **Policy Period**.

This endorsement is to take effect on: **04/01/2019**
Policy Number: **CYB-1002552-00**
Policy Inception Date: **04/01/2019**
Policy Expiration Date: **04/01/2020**
Endorsement Number: **CB-136-001**

All other terms and conditions of the Policy remain unchanged.



HUDSON EXCESS INSURANCE COMPANY

# Service of Suit Endorsement - Arkansas
## SS – AR (5/17)

It is hereby agreed by the Company and the Named Insured that:

In the event of a failure by the Company to pay any amount claimed to be due under this policy, the Company will, at the Named Insured's request, submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the court jurisdiction. Nothing in this endorsement constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. In a suit instituted against the Company under this contract, the Company agrees to abide by the final decision of the court or of any appellate court in the event of an appeal.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision therefore, the Company will designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as the Company's true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or its beneficiary arising out of this contract of insurance.

The officer named below is authorized and directed to accept service of process on the Company's behalf:

**Commissioner of Insurance**
**1200 West Third Street**
**Little Rock, AR 72201-1804**

Having accepted service of process on the Company's behalf, the officer is authorized to mail the process or a true copy to:

**Dina G Daskalakis**
**Hudson Excess Insurance Company**
**Administrative Office**
**100 William Street, 5th floor**
**New York, NY 10038**



Named Insured: **The Heritage Company, Inc**

Policy Number: **CYB-1002552-00**

Policy Inception Date: **04/01/2019**

Policy Expiration Date: **04/01/2020**

Endorsement Number: **CB-547-001**

All other terms and conditions of the Policy remain unchanged.



HUDSON INSURANCE GROUP

# Privacy Notice

To Our Customers:

You provide us with most of the information about you that we use in evaluating your application and servicing your insurance policy. We may collect non-public personal information about you from any of the following sources: Information from you on your application and other forms; Information about your transactions with Hudson Insurance Group, our affiliates or others; and information we receive from a consumer reporting agency. Depending on the nature of your coverage, we may collect information about you from third parties, such as other persons proposed for coverage under your policy or the State Motor Vehicle Department concerning your driving record.

We do not disclose any non-public information about our customers or former customers to anyone, except (i) for our everyday business purposes such as to process insurance transactions, maintain and adjust claims, respond to court orders and legal investigations, or (ii) as otherwise permitted by law. In some cases this may mean information can be disclosed to third parties without your authorization.

We restrict access to information about you to employees who need to know in order to provide you with products or to provide you benefits or services under them. We maintain physical, electronic, and procedural safeguards that comply with state and federal regulations to guard your non-public personal information.

You have the right to obtain access to certain items of information we have collected about you, and you have the further right to request correction of information if you feel it is inaccurate.

We would be pleased to tell you about our policies and procedures for the privacy of your information. For a copy of our privacy policy or to access your information, please contact us at:

Hudson Insurance Group

100 William Street, Floor 5

New York, NY 10038

Tel. (212) 978-2800

Fax. (212) 978-2899

www.hudsoninsgroup.com



## Important Notice

IN COMPLIANCE WITH THE REQUIREMENTS OF THE FAIR CREDIT REPORTING ACT (PUBLIC LAW 91-508), HUDSON INSURANCE GROUP ADVISES THAT AS PART OF OUR ROUTINE PROCEDURE IN REVIEWING APPLICATIONS FOR INSURANCE OR RENEWALS OF INSURANCE POLICIES, WE MAY PROCURE A CONSUMER REPORT INCLUDING INFORMATION AS TO THE CONSUMER'S CHARACTER, GENERAL REPUTATION, PERSONAL CHARACTERISTICS OR MODE OF LIVING. IF SUCH INSURANCE IS FOR AN INDIVIDUAL AND IS PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES, SUCH INFORMATION MAY BE OBTAINED THROUGH PERSONAL INTERVIEWS WITH NEIGHBORS, FRIENDS OR OTHERS WITH WHOM THE CONSUMER IS ACQUAINTED.

UPON REQUEST TO THIS INSURANCE COMPANY, IN ANY MANNER AS NOTED ABOVE, WE WILL PROVIDE, IN WRITING, A COMPLETE AND ACCURATE DISCLOSURE OF THE NATURE AND SCOPE OF THE CONSUMER REPORT REQUESTED OR ADVISE THAT NO INVESTIGATION WAS CONDUCTED.

Hudson Insurance Group consists of:
Hudson Insurance Company
Hudson Specialty Insurance Company
Hudson Excess Insurance Company

 CORVUS

# PRIVACY POLICY

Hudson Insurance Group does not disclose any nonpublic personal information about individual policyholders or claimants to any affiliate or any non-affiliate third party other than those permitted by law and only for the purpose of transacting the business of the policyholder's insurance coverage or claim.

Hudson Insurance Group consists of:

Hudson Insurance Company

Hudson Specialty Insurance Company

Hudson Excess Insurance Company

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

### HERITAGE COMPANY, INC.

#### PLAINTIFF

v.                                 **CASE NO. No. 4:22CV00082-JM**

### HUDSON EXCESS INSURANCE COMPANY, et al.                **DEFENDANTS**

#### AFFIDAVIT OF JENNIFER FRANECKE

I, Jennifer Franecke, first being duly sworn and attest that if called to testify I can do so competently about the information and facts stated by me in this affidavit in support of Heritage's Motion for Partial Summary Judgment.

1.      During 2019 – 2020 I was employed by the Heritage Company, Inc. ("Heritage") as Vice President, Chief Strategy Officer, and a percentage owner of the company.

2.      I was directly involved in the acquisition of the Hudson Access Insurance Company's "Smart Cyber Insurance Policy for the Heritage Company, Inc." ("Policy") effective April 1, 2019, to April 1, 2020, Policy Number CYB 1002552-00. A true and accurate copy of said Policy is attached to the Heritage complaint filed in this matter and as attached as Exhibit A to Heritage's Motion for Partial Summary Judgment.

3.      Hudson's insurance agent had provided numerous other insurance policies for Heritage's business needs. He was very familiar with Heritage's business. He provided and recommended the Policy to me and Heritage. Heritage paid the full premium required for the issuance of the Policy.

1                                    Exhibit B

4. On or about October 15, 2019, Heritage suffered a catastrophic ransom demanded cyber-attack, shutting down its entire computer system and triggering the insurance coverage provisions of the Policy.

5. I was directly involved in the process of working with Hudson in the process of resolving the payment of the ransom demanded and fixing the damage to Heritage caused by the cyber-attack.

6. Hudson acknowledged the claim for damages suffered by Heritage. Hudson paid for, among other things, assisting independent attorneys, computer repair specialists, a ransom in the amount of about $250,000 to free up Heritage computers, Heritage forensic accountants in the amount of $50,000 and partial payment of "Business Loss" to Heritage by stipulation that said payment was not a waiver of further payments to be determined before this court.

7. Heritage's business interruption lasted from October 15, 2019, until December 20, 2019, plus a Policy extension of 30 days to January 20, 2020.

8. The Policy covers Heritage's Business Interruption Loss to a limit of liability of $3,000,000 for each claim.

9. Heritage is not a manufacturing business, and it does not have raw stock, materials, or supplies used by a manufacturing business.

10. Heritage has suffered net loss profit before income tax during the interruption which I understand is subject to proof of amounts at trial by forensic accounting.

11. Heritage has suffered the cost of normal operating expenses (including payroll) during the interruption period. Heritage had to continue during the interruption period as if no cyber-attack had occurred in order to generate some revenue subject to proof by forensic accounting at trial.

2

12.     Heritage and I were told repeatedly by the computer company recommended by Hudson to "fix" the computer database non-access problems, that the problems would be fixed soon. Unfortunately, the computer problems were not fixed from October 15, 2019 by December 20, 2019. Heritage relied on the representations, paid full employment salaries, and limped along in a severely diminished capacity in trying to fulfill its customer contracts through December 20, 2019. Payment of salaries is a specific requirement to generate any revenue in the Heritage business model and as I understand is a mitigation of damages.

13.     I have reviewed the Heritage "Plaintiff's Brief in Support of Motion For Partial Summary Judgment" and know the factual statements contained in the sub headings of "Heritage History" and "The Specific Heritage Business Model And Why The Cyber Attack Crippled Heritage" to be true and accurate statements regarding Heritage's business model, history, function and methods including the reasons for the crippling effect of the cyber-attack.

I declare under penalty of perjury that the foregoing is true and correct.

Jennifer Franecke

3

## VERIFICATION

STATE OF ARKANSAS    )

                          )   SS

COUNTY OF Pulaski   )

       SUBSCRIBED and SWORN to before me, a Notary Public in and for the State of Arkansas, on this 28th day of October_____, 2022.



[SEAL]

_____

NOTARY PUBLIC

My commission expires: 01-16-2029

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**HERIGAGE COMPANY, INC.**                                            **PLAINTIFF**


**v.**                                    **CASE NO. No. 4:22CV00082-JM**

**HUDSON EXCESS INSURANCE COMPANY, et al.**                  **DEFENDANTS**

### AFFIDAVIT OF JOHN TONEY

I, John Toney, first being duly sworn and attest that if called to testify I can do so competently about the information and facts stated by me in this affidavit in support of Heritage's Motion for Partial Summary Judgment.

1.       During 2019 – 2020 I was employed by the Heritage Company, Inc. ("Heritage") as Financial Advisor.

2.       Heritage was issued a policy of cyber insurance by the Hudson Access Insurance Company ("Hudson") called "Smart Cyber Insurance Policy for the Heritage Company, Inc." ("Policy") effective April 1, 2019 to April 1, 2020, Policy Number CYB 1002552-00. I understand the Policy to be attached as Exhibit A to Heritage's Motion for Partial Summary Judgment.

3.       Hudson's insurance agent had provided numerous other insurance policies for Heritage's business needs. He was very familiar with Heritage's business and how it operated. He provided and recommended the Policy to Heritage. Heritage paid the full premium required for the issuance of the Policy.

4.       Heritage's business interruption lasted from October 15, 2019, until December 20, 2019, plus a Policy extension of 30 days to January 20, 2020.

Exhibit C

1

5.     Heritage is not a manufacturing business, and it does not have raw stock, materials, or supplies used by a manufacturing business.

6.     Heritage, as a result of the cyber-attack, was prevented from generating its normal revenue and suffered a net loss profit before income tax during the interruption period subject to, I understand, proof of the loss amounts at trial by forensic accounting.

7.     Heritage has suffered the cost of normal operating expenses (including payroll) during the interruption period. Heritage had to continue during the interruption period as if no cyber-attack had occurred in order to generate some revenue subject to proof of the amounts by forensic accounting at trial.

8.     Payment of salaries and other operating expenses is a specific requirement of the Heritage business model to generate any revenue and results, as I understand it, in a mitigation of damages in the claim for insurance reimbursement from Hudson under the Policy.

9.     I have reviewed a Heritage "Plaintiff's Brief in Support of Motion for Partial Summary Judgment" and know the factual statements contained in the subheadings of "Heritage History" and "The Specific Heritage Business Model And Why The Cyber Attack Crippled Heritage" to be true and accurate statements regarding the Heritage's business model, history, function and methods including the reasons for the crippling effect of the cyber-attack.

I declare under penalty of perjury that the foregoing is true and correct.

John Toney

## VERIFICATION

**STATE OF ARKANSAS** )

                   )      **SS**

**COUNTY OF** _Lonoke_ )

        SUBSCRIBED and SWORN to before me, a Notary Public in and for the State of Arkansas, on this _26th_ day of _October_ _____, 2022.



**[SEAL]**

                                              **NOTARY PUBLIC**

                                              My commission expires: _August 1, 2026_

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**


**HERIGAGE COMPANY, INC.**                                                    **PLAINTIFF**


**v.**                          **CASE NO.** No. 4:22CV00082-JM


**HUDSON EXCESS INSURANCE COMPANY, et al.**               **DEFENDANTS**


**AFFIDAVIT OF LOUIS S. FRANECKE IN SUPPORT OF MOTION FOR**

**PARTIAL SUMMARY JUDGMENT, FRCP 56(a)**


I, Louis Franecke, Esq. first being duly sworn and attest that if called to testify I can do so competently about the information and facts stated by me in this affidavit in support of Heritage's Motion for Partial Summary Judgment:

1.      That I am an attorney duly licensed to practice law in the state of California and am also admitted in this Hon. United States District Court, Eastern District of Arkansas, Central divisions pro hoc vice for prosecution of this case on behalf of plaintiff The Heritage Company, Inc.

2.      That I have been involved in the discussions and mediations of Heritages claim to defendant Hudson Access Insurance Companies and their attorneys of record since before the litigation herein and since early 2020.

3.      That as a part of the ongoing prosecution of the claim by Heritage to Hudson, it was stipulated and agreed between the parties that Hudson would pay to Heritage a portion of

Exhibit D

Heritage's claimed damages without waiver of additional monetary damages to which Heritage was entitled to be paid by Hudson by further agreement or Judgment of this court. Hudson made such payment pursuant to the stipulation and agreement as herein stated.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24 day of October, 2022 at San Rafael, California.

LOUIS FRANECKE, ESQ.
Attorney for The Heritage Company, Inc.

AFFIDAVIT OF LOUIS S. FRANECKE IN SUPPORT O F MOTION FOR PARTIAL SUMMARY JUDGMENT