IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**HERITAGE COMPANY, INC.**                                                                                           **PLAINTIFF**

V.                                      NO. 4:22-cv-82-JM

**HUDSON EXCESS INSURANCE COMPANY**                                       **DEFENDANT**

### ORDER

This case involves an insurance dispute arising out of a cyber ransomware attack on Heritage Company, Inc. ("Heritage"), a telemarketer for nonprofit corporations. Pending are cross motions for partial summary judgment filed by Heritage and its insurer, Hudson Excess Insurance Company ("Hudson"). (Doc. Nos. 43, 50). Also pending is Hudson's motion to exclude some of the opinions of Heritage's expert. (Doc. No. 74). For the reasons stated below, the Court grants Hudson's motion, denies Heritage's motion, and grant's Hudson's motion regarding the expert witness.

### Background

The ransomware attack occurred on October 15, 2019 and disrupted Heritage's business for months. Heritage was covered by a Smart Cyber Insurance Policy issued by Hudson at the time of the attack. (Doc. No. 43, Ex. A). The policy provides coverage for the following losses pursuant to the business interruption agreement:

> Business Income Loss and Extra Expenses incurred during the Interruption Period directly as a result of the total, or partial, or intermittent interruption or degradation in service of an Insured's Computer System caused directly by a Privacy Breach, Security Breach, Administrative Error or Power Failure.

(*Id.* at 16, Sec. II.A.). [1] In their cross motions for partial summary judgment, both parties ask

---

[1] Page references will be to the pages as numbered in the Court's electronic filing system, Doc. No. 43, Ex.A, rather than the page numbers of the policy itself.

the Court to determine the correct methodology for calculating Business Income Loss." The policy provides the following definitions:

> Business Income Loss:
>
> a. The net profit before income taxes that the Insured is prevented from earning during the Interruption Period; and
>
> b. Normal operating expenses incurred by the Insured (including payroll), but solely to the extent that such operating expenses must continue during the Interruption Period and would have been incurred had there been no interruption or degradation in service.
>
> Business Income Loss, as used in as used in item a. [s]hall mean:
>
> For manufacturing operations, the net sales value of production less the cost of all raw stock, materials and supplies used in such production.

(*Id.* at 25).

The Business Income Loss definition was amended by endorsement to include:

> c. Forensic Accounting Costs; provided, however, that the Company's maximum liability for such costs shall be $50,000, which amount shall be part of, and not in addition to, the limit of liability for Insuring Agreement II.A. Business Interruption and Insuring Agreement II.B. Contingent Business Interruption.
>
> Forensic Account Costs means those costs and expenses of establishing or proving an Insured's Loss [under the Business Interruption and Contingent Business Interruption agreements], including, without limitation, those connected with preparing a proof of loss. All loss described in this paragraph must be reported, and all proofs of loss must be provided, to the Underwriters no later than 6 months after the end of the Policy Period.

(*Id*. at 56)

The definition of Business Income Loss excludes, among other items, "other consequential loss or damage" and "extra expenses." (*Id.* at 25). While excluded as an element of damages for Business Income Loss, loss from Extra Expenses is included in the coverage of the business interruption agreement. Here is the policy definition:

>Extra Expenses:
>
>Reasonable and necessary extra costs incurred by the Insured to temporarily continue as nearly normal as practicable in the conduct of the Insured's business during the Interruption Period, less any value remaining at the end of the Interruption Period for property or services obtained in connection with such costs. 'Normal' shall mean the condition that would have existed had no Privacy Breach, Security Breach, Administrative Error or Power Failure occurred.

(*Id.* at 28).

The policy has a $3,000,000 limit of liability for each claim under the business interruption insuring agreement. (*Id.* at 9). It has a maximum policy aggregate limit of $3,000,000. (*Id.*). The stated period of indemnity for business interruption is six months. (*Id.*)

Heritage puts forth as fact that its business interruption period was from October 15, 2019 until December 20, 2019, plus the benefit of the 30-day extension provided to allow for restoration of its business. Hudson agrees that the interruption period began with the October 15 attack, but states that it needs discovery to determine when Heritage's computer system was fully restored and whether the thirty-day extension applies. This fact can be resolved at trial and does not prevent the Court from ruling on the parties' motions for partial summary judgment as to the correct methodology for calculating damages.

Hudson has paid certain sums pursuant to the policy, with a stipulation between the parties that Heritage's acceptance of the payments was not a waiver of additional payments.

Legal Framework

Summary judgment is appropriate only when the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Cross-motions for summary judgment require viewing the evidence in the light most favorable to the plaintiff and defendant in turn, depending

on whose motion is being considered. *Pitman Farms v. Kuehl Poultry, LLC*, 48 F.4th 866, 875 (8th Cir. 2022).

The substantive laws of Arkansas govern this diversity action. Arkansas law on the interpretation of insurance policies is well settled:

> The language in an insurance policy is to be construed in its plain, ordinary, and popular sense. If the language is unambiguous, this court will give effect to the plain language of the policy without resorting to the rules of construction. In considering the phraseology of an insurance policy the common usage of terms should prevail when interpretation is required. On the other hand, if the language is ambiguous, this court will construe the policy liberally in favor of the insured and strictly against the insurer. Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation.

*Philadelphia Indem. Ins. Co. v. Austin*, 2011 Ark. 283, 6–7, 383 S.W.3d 815, 819–20 (2011) (internal citations and quotations omitted). Furthermore, "[t]he rights and liabilities of the parties to an insurance contract must be determined by considering the language of the entire policy. Legal effect must be given to all the language used, and the object to be accomplished by the contract should be considered in interpreting it." *Cont'l Cas. Co. v. Davidson*, *Cont'l Cas. Co. v. Davidson*, 250 Ark. 35, 41-42, 463 S.W.2d 652, 655 (1971) (internal citations omitted).

Both parties assert that the policy language is unambiguous, but they argue different interpretations of the language. However, "[t]he mere fact that parties disagree as to how a policy should be interpreted does not make the policy ambiguous as a matter of law." *Clarksville Sch. Dist. v. Ace Am. Ins. Co.*, 2021 Ark. App. 308, 5–6 (2021). The Court finds that the language in the policy regarding business income loss is not ambiguous.[2]

---

[2] Plaintiff incorrectly characterizes Defendant's reliance on authority from other jurisdictions as an attempt to introduce extrinsic evidence.

Analysis

As set forth above, the policy definition of Business Income Loss in section (a) includes "net profit before income taxes that the Insured is prevented from earning during the Interruption Period." While "net profit" is not defined in the policy, the term does not require extrinsic evidence to establish its meaning. Arkansas courts have previously held that "[o]bviously 'net profit' means that [profit] which is left after payment of necessary expenses." *Plastics Rsch. & Dev. Corp. v. Norman*, 243 Ark. 780, 783, 422 S.W.2d 121, 123 (1967). *Also see* Black's Law Dictionary (11th ed. 2019) defining net profit as "total sales revenue less [] all additional expenses." Stated simply "net profit" refers to when revenues exceed expenses. Applying that definition to this policy makes it clear that section (a) of the Business Loss coverage is meant to insure any lost profit incurred during the Interruption Period resulting from a covered loss as if the loss had not occurred.

The policy further limits these lost net profits to those caused directly as a result of the ransomware attack. Heritage takes the position that the language addressing business income loss for manufacturing operations[3] is provided as an example of how to calculate net profits. Specifically, Heritage argues that this example does not mention operating expenses. Heritage presents no authority that would allow the Court to treat this policy provision as an example. A plain reading of this provision limits its application to manufacturing operations. As such, it has no application to Heritage, which is not a manufacturer.

In addition to the net profit provision in section (a), the definition of Business Income Loss in section (b) also includes recovery for "normal operating expenses incurred by the Insured

---

[3] "For manufacturing operations, the net sales value of production less the cost of all raw stock, materials and supplies used in such production." Doc. No. 43, at 25

(including payroll), but solely to the extent that such operating expenses must continue during the Interruption Period and would have been incurred had there been no interruption or degradation in service." Hudson argues that to prevent Heritage from receiving a windfall, this provision must be read with the qualifying phrase "normal operating expenses . . . *that were not paid using any revenue actually earned* during the Interruption Period . . ." The Court agrees. Section (b) of the Business Loss provision unambiguously provides for coverage for the shortfall a business might experience due to incurring "normal operating expenses" while also incurring abnormally low revenue during an Interruption Period. An insured may still earn some revenue, albeit abnormally low, while still incurring unavoidable "normal operating expenses." Section (b) of the Business Loss insures against this risk. Therefore, to the extent Heritage incurred a partial or whole loss of its revenue to cover normal operating expenses during the Interruption period, Heritage would be entitled to recover this shortfall but only to the extent of the normal expenses incurred.

As defined in the Extra Expenses definition, normal refers to the continuation of the business "as nearly normal as practicable," that is "the *condition* that would have existed" had there been no ransomware attack.[4] The Court sees no reason to use this definition of normal elsewhere in the policy.

The Court must interpret the insurance policy with consideration "for the object to be accomplished" by the policy. *Cont'l Cas. Co.*, 463 S.W.2d at 655. The Arkansas Court of Appeals has stated that "the purpose of business interruption insurance is to protect the prospective earnings of the insured business only to the extent to that which the business would have earned had no interruption occurred. While the policy is aimed at protecting the insured, it

---

[4] *Id.* at 28. (Emphasis added.)

is also designed to prevent the insured from being placed in a *better* position than if no loss or interruption of the business had occurred. *Liberty Mut. Ins. Co. v. Sexton Foods Co.*, 42 Ark. App. 102, 106, 854 S.W.2d 365, 367 (1993) (internal quotations omitted) (quoted in *Welspun Pipes, Inc. v. Liberty Mut. Fire Ins. Co.*, 891 F.3d 351, 357 (8th Cir. 2018)). *See also* 11A Couch on Ins. § 167:9.[5]

Within this legal framework, the Court finds Hudson's interpretation of section (b) of the definition of Business Income Loss is correct. The correct methodology to determine Heritage's covered business income loss is to subtract from covered "normal operating expenses" those that Heritage was able to pay from revenue it received during the Interruption Period. To the extent Heritage was able to pay these expenses, they did not constitute a loss. Therefore, to recover for them would place Heritage in a better position than it would have been in had there been no interruption in business.

Therefore, Hudson's motion for partial summary judgment is granted, and Heritage's motion is denied.

Hudson's Motion to Exclude Certain Opinions of Plaintiff's Expert

The Court does not need expert testimony to interpret the policy language. To the extent Heritage's expert's testimony is offered for this purpose, Hudson's motion to exclude is granted. Any other lay or expert testimony regarding damages calculations consistent with this order is welcome.

---

[5] "The purpose of business interruption insurance is to compensate an insured for losses stemming from an interruption of normal business operations due to damage or destruction of property from a covered hazard[1] thus preserving the continuity of the insured's business earnings by placing the insured in the position that it would have occupied if there had been no interruption. . . . A business interruption policy may not, however, be utilized to place the insured in a better position than it would have enjoyed without the occurrence of the covered peril."

## Conclusion

For the reasons stated above, Heritage's motion for partial summary judgment (Doc. No. 43) is DENIED; Hudson's motion for partial summary judgment (Doc. No. 50); and Hudson's motion to exclude certain opinions of Heritage's expert Clay Glasgow (Doc. No. 74) is GRANTED to the extent stated above.

IT IS SO ORDERED this 22nd day of May, 2024.

_____
United States District Court Judge